In re CALYPSO ZAMIAS L.P., Debtor.

Whitehall Street Real Estate Limited Partnership IX, Whitehall Street Real Estate Limited Partnership XI, WXI/BUF/W Real Estate Limited Liability Company, WXI/BUF Gen–Par/W, L.L.C., WXI/MLM/W Real Estate Limited Partnership, WXI/MLM Gen–Par/W, L.L.C., W9/MLM Real Estate Limited Partnership, W9/MLM Gen–Par, L.L.C., W9/MLM/B Real Estate Limited Partnership, W9/MLM/B Gen–Par, L.L.C., and W9/MLM/E Real Estate Limited Partnership, Plaintiffs,

v.

Zamias Services, Inc., Calypso Zamias Limited Partnership, Protesilaus Zamias Limited Partnership, Damian Zamias, Proteus Zamias, L.P., Proteus Zamias Euclid, L.P., Proteus Zamias Brickyard, L.P., First Commonwealth Financial Corporation, d/b/a Cenwest Bank, and Promistar Bank, Defendants.

Bankruptcy Nos. 01–25077–BM, 01–25079BM.

Adversary No. 01–2175–BM.

United States Bankruptcy Court, W.D. Pennsylvania.

June 4, 2003.

James R. Walsh, Esq., Spence, Custer, Saylor, Wolfe & Rose, Johnstown, PA, for debtor.

George M. Cheever, Esq., Kirkpatrick & Lockhart, LLP, Gary J. Gaertner, Grenen & Birsic, P.C., Michael Kaminski, David W. Lampl, Leech, Tishman, Fuscaldo & Lampl, LLC, Pittsburgh, PA, Jeffrey A. Crossman, M. Colette Gibbons, Stuart L. Larsen, Kahn, Kleinman, Yanowitz & Arson Co., Cleveland, OH, John R. O'Keefe, Jr., Metz, Schermer & Lewis, LLC, Richard Allen Pollard, Pietragallo, Bosick & Gordon, Peter A. Santos, Dickie, McCamey & Chilcote, P.C., Pittsburgh, PA, Mark D.

Taylor, Akin, Gump, Strauss, Hauer & Feld L.L.P., Washington, DC, for creditor.

Kathleen Robb, Pittsburgh, PA, U.S. Trustee.

### MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Plaintiffs in this adversary action ("the Whitehall entities") seek to recover the sum of $5,095,701.20 which debtor Zamias Services, Inc. ("ZSI") withdrew at the direction of debtor Damian Zamias ("DZ") from various bank accounts under its control plus interest on this amount. The Whitehall entities also seek a determination that a portion of the interest is entitled to priority as a post-petition administrative expense. Finally, the Whitehall entities assert that debtors Damian Zamias and George Zamias are personally liable to them for this amount and seek a determination that the resulting debt is excepted from discharge.

Seeking to nullify the claim of the Whitehall entities, ZSI has asserted a counterclaim against them in the amount of $5,078,795.34 for fees and expenses allegedly owed by the Whitehall entities. Debtors Damian and George Zamias deny that they owe any debt to the Whitehall entities which is excepted from discharge.

We conclude for reasons set forth in this Memorandum Opinion that the Whitehall entities are entitled to a judgment in their favor and against debtors ZSI and Damian Zamias in the amount of $4,729,044.66. Said debt is excepted from discharge in the case of Damian Zamias by virtue of § 523(a)(4) of the Bankruptcy Code. The Whitehall entities have, however, failed to demonstrate that debtor George Zamias is personally liable to them in any amount and, accordingly, have failed to demonstrate that he owes them a debt which is excepted from discharge.

— FACTS —

Plaintiffs are joint ventures which own shopping malls in various locations or are the operating members or general partners of the joint ventures (hereinafter "the Whitehall entities").

Defendants Calypso Zamias Limited Partnership, Protesilaus Zamias Limited Partnership and Proteus Zamias, L. P., are limited partners of the entities operating the properties.

Defendant Zamias Services, Inc. (hereinafter "ZSI") managed the joint venture properties pursuant to various leasing and management agreements.

Defendant Damian Zamias is president and CEO of ZSI. Defendant George Zamias is the father of Damian Zamias.

Defendants Proteus Zamias Euclid and Proteus Zamias Brickyard are entities controlled by one or more members of the Zamias family.

From 1997 through 1999, the above property owners entered into substantially identical leasing and management agreements with ZSI after lengthy negotiations in which both sides were represented by experienced legal counsel. Damian Zamias was personally involved and was a key participant in the negotiations preceding the leasing and management agreements. ZSI was responsible, among other things, for managing, operating, leasing and maintaining the properties and for collecting rents due from tenants.

ZSI was obligated by the leasing and management agreements to establish and maintain separate operating accounts for each property into which it was to deposit all revenues received from the operation of the properties. ZSI held the funds in the

operating accounts in trust for the property owners (¶ 3.01(a)).

Pursuant to this provision, ZSI established and maintained various operating accounts at Cenwest Bank and Promistar Bank into which it deposited revenues generated from its management of the properties.

ZSI was authorized to collect rents and other amounts due from tenants of the properties. All amounts so collected were the property of the property owner and were to be deposited into the operating accounts (¶ 2.06(a)).

ZSI's authority to make withdrawals from the operating accounts ceased immediately upon termination of the leasing and management agreements (¶ 3.01(d)).

The term of a leasing and management agreement became effective on the date set forth therein and terminated on the first anniversary thereof. Said term was automatically renewable for successive one-month periods, unless either party delivered written notice of termination at least thirty days prior to commencement of the then next succeeding renewal period (¶ 7.01).

A property owner also could at any time terminate a leasing and management agreement for cause on five business days' prior written notice to ZSI (¶ 7.03). ZSI's authority under the agreement ceased immediately upon its termination and it had no further right to act on behalf of the owner or to draw checks on the operating account (¶ 7.04(b)). ZSI was entitled in the event of its termination to payment of any management fees and reimbursable expenses that had accrued through the effective date of its termination (¶ 7.04(d)).

As its fee for managing a property, ZSI was entitled to an amount equal to four percent of gross receipts it actually collected during the immediately preceding month. Upon submission to the property owner of a monthly report for the preceding month, ZSI had the right to withdraw its management fee from the appropriate operating account (¶ 6.01(a)). ZSI also was entitled to payment of various leasing and legal fees (¶ 6.01(c)).

If an audit disclosed a deficiency in the amount of funds ZSI should have delivered to the property owner, ZSI was required to deliver such deficiency to the property owner along with simple interest at the rate of ten percent per year (¶ 3.05).

Each leasing and management agreement was governed by and was to be construed in accordance with the laws of the State of New York and represented the entire agreement of the parties with respect to its subject matter. An agreement could not be changed, waived, discharged or terminated orally but only by a written instrument signed by the person or entity against whom enforcement was sought (¶ 9.05).

The operating general partners of the joint ventures notified ZSI by letter on December 7, 2000, that the leasing and management agreements were being terminated for cause. In the event termination for cause was ineffective, ZSI was to be terminated without notice effective thirty days from the date of the notice.

Follow-up letters were sent to ZSI the next day which stated that, during the transition to a new property manager, ZSI would have no authority without prior approval to pay itself from the operating accounts for any fees or expenses that had accrued.

The operating general partners sent ZSI a second round of letters on January 16, 2001. The letters stated, among other things, that the notices of termination without cause contained in the previous letter were "now effective and the Man-

agement Agreement is therefore terminated". In addition, the letters stated that ZSI was in default of the leasing and management agreements and was terminated for cause pursuant to ¶ 7.03 thereof. A demand was made that ZSI vacate all the properties within five days.

Letters were sent to ZSI eight days later, on January 24, 2001, confirming ZSI's termination and reminding ZSI that it no longer had authority to make withdrawals or to otherwise direct application or payment of funds in the operating accounts.

Unbeknown to the property owners and the operating general partners, and without their consent, at the direction of Damian Zamias ZSI withdrew $1,086,314.00 from certain of the operating accounts on January 22, 2001. Damian Zamias further directed ZSI to make four additional withdrawals on February 21, 2001, February 22, 2001, March 29, 2001, and April 27, 2001, respectively. These additional withdrawals were made after General Growth had supplanted ZSI as manager of the properties late in January of 2001 and amounted to $590,594.03. The total amount of all five withdrawals was $1,676,908.03. ZSI also refused to turn over to the Whitehall entities the amounts still remaining in the operating accounts after these withdrawals were made.

At the direction of Damian Zamias, the withdrawn funds initially were deposited into the account of another Zamias-related entity for the purpose of placing them beyond the reach of American Property Consultants (hereinafter "APC"), which had garnished ZSI's bank accounts in an attempt to satisfy a $12,000,000.00 judgment APC had against ZSI. Thereafter the funds were used to pay obligations of ZSI and other Zamias-related entities.

ZSI, Calypso Zamias, Protesilaus Zamias, Damian Zamias and George Zamias

filed voluntary chapter 11 petitions on May 11, 2001.

The Whitehall entities commenced this adversary action on May 17, 2001, only six days after the filing of the above chapter 11 petitions. An amended complaint was filed on January 8, 2002. In it they asserted that ZSI had made a series of unauthorized withdrawals from the operating accounts subsequent to the termination notices dated December 7, 2002, and January 16, 2002, for the ostensible purpose of collecting sums allegedly due and owing to ZSI under the leasing and management agreements. Each withdrawal, they further asserted, was made at the direction of Damian Zamias, who knew or should have known that he had no authority to order the withdrawals.

Counts I, II and III are against all the Zamias defendants and respectively assert claims for conversion, replevin and misappropriation. Count IV states a claim against Cenwest Bank and Promistar Bank and seeks to prevent further dissipation of the funds in the operating accounts and requests an accounting. Count V seeks a determination that Damian Zamias owes a debt to the Whitehall entities which is excepted from discharge by § 523(a)(4) and/or § 523(a)(6) of the Bankruptcy Code. It also alleges that George Zamias conspired with and assisted Damian Zamias and seeks a determination that he too owes them a debt which is excepted from discharge by these same provisions.

Among other things, the Whitehall entities requested an order directing defendants to return the withdrawn funds, an award of monetary damages in excess of $7,500,000, and an order declaring that the debt owed to them by Damian and George Zamias is excepted from discharge.

On the day they filed their complaint, the Whitehall entities also brought a mo-

tion for a preliminary injunction directing the release of funds allegedly exceeding $12,000,000.00 which had been withdrawn from the operating accounts subsequent to ZSI's termination.

The Zamias defendants responded that the Whitehall entities owed ZSI in excess of $4,2000,000.00 for unpaid management fees and leasing fees. They further responded, among other things, that they were not opposed to releasing funds in the operating accounts in excess of $4,200,000, provided that the Whitehall entities obtained consents and releases from creditors asserting an interest therein.

APC, which held a $12,000,000 pre-petition judgment against ZSI, opposed the motion on the ground that debtors' bankruptcy estates might have an interest in the disputed funds.

We issued an order after a hearing on May 29, 2001, denying the motion of the Whitehall entities. Debtors' bankruptcy cases had barely begun when the order was requested and we knew little or nothing about the status of the disputed funds.

In their answer to the amended complaint in the adversary action, ZSI denied that it had unlawfully withdrawn funds from the operating accounts and denied that Damian Zamias and George Zamias owed a debt to the Whitehall entities which was excepted from discharge. In addition, ZSI also asserted a counterclaim for various fees for services allegedly rendered and for various costs it allegedly had incurred relating to termination of the leasing and management agreements.

On September 25, 2001, the Whitehall entities once again requested a preliminary injunction wherein they asserted that the Zamias defendants had admitted in a supplemental response to the amended complaint that ZSI had recouped approximately $1,3000,000 of the amount allegedly due

and owing to it. This, the Whitehall entities claimed, contradicted the assertion of the Zamias defendants in their previous response to the previous motion for a preliminary injunction that no funds had been withdrawn from the operating accounts.

In their response to this second motion for a preliminary injunction, the Zamias defendants asserted that they unwittingly had "misspoken" when they previously denied having withdrawn any funds from the operating accounts. Their prior response, they continued, had been prepared in haste and without realizing that withdrawals had been made in partial satisfaction of the amounts owed to ZSI by the Whitehall entities.

At the hearing on the second motion for a preliminary injunction, APC again opposed the motion for basically the same reasons that it opposed the first motion.

We issued an order after a hearing on October 2, 2001, once again denying the motion of the Whitehall entities. We did, however, prohibit the Zamias defendants from utilizing any funds still remaining in the operating accounts and directed all principals, insiders and affiliated entities to "freeze in place" any remaining portion of the funds from the operating accounts which were under their control.

A consent order was approved on April 4, 2002, wherein ZSI agreed to return to the Whitehall entities the balance remaining in the operating accounts except for $3,418,792.17. The exact amount ZSI turned over to the Whitehall entities pursuant to the order is not clear. The amount ZSI retained, when combined with the funds it previously had withdrawn from the operating accounts, apparently was thought by ZSI to be sufficient to cover its counterclaim.

Trial of this adversary action commenced on October 18, 2002. It resumed

on December 4, 2002, and was completed on December 6, 2002. Thereafter, post-trial briefs were tendered. With the agreement of the parties, this decision was postponed due to conciliation of the issues with another judge in this court. When it became patently obvious that the parties could not amicably resolve their differences, this Opinion was prepared and issued.

## — DISCUSSION —

### — I —

It is undisputed that the properties ZSI managed were owned by the various Whitehall entities. ZSI had no ownership interest in the properties.

The same is true of the rents and other revenues ZSI collected from tenants and deposited in the various operating accounts. The leasing and management agreements expressly stated that amounts so collected by ZSI were the property of the property owners of the malls and were to be deposited by ZSI into the operating accounts (¶ 2.06(a)). ZSI held all funds so received in trust for the property owners (¶ 3.01(a)).

Starting on January 22, 2001, and ending on April 27, 2001, ZSI made a series of withdrawals from various operating accounts it maintained in connection with certain of the properties owned by the Whitehall entities. The withdrawals, each of which Damian Zamias directed be made, totaled $1,676,908.03. These withdrawn funds, which were used to pay obligations of ZSI and other Zamias-related entities, were never returned to the Whitehall entities.

A consent order was issued on April 4, 2001, whereby ZSI finally relented and agreed to turn over to the Whitehall entities all but $3,418,792.17 of the funds remaining in various operating accounts.

Among other things, the Whitehall entities still seek in this adversary action to recover from the Zamias defendants the amount ZSI withdrew from the operating accounts—i.e., $1,676,908.03—as well as the funds ZSI retained when it turned over to the Whitehall entities the funds remaining in the operating accounts on April 4, 2001—i.e., $3,418,793.17. These withdrawn funds and retained funds total $5,095,701.20.

The extent of the monetary recovery sought by the Whitehall entities does not end there. Interest also is sought at the rate prescribed in the leasing and management agreements for the loss of use of the withdrawn and retained funds.

Paragraph 3.05 of the leasing and management agreements provided in part that:

... if any audit discloses a deficiency in the amount of funds which Manager should have delivered to Owner,... Manager shall immediately deliver such deficiency to Owner, together with interest thereon at the rate of ten percent (10%) per annum.

The Whitehall entities also seek to recover accrued interest at this contract rate through the date judgment is entered in their favor for the loss of use of $1,676,908.03 ZSI withdrew from the operating accounts and spent. The amount of interest sought for the loss of use of these funds exceeds $275,512.37.

In addition, the Whitehall entities seek to recover accrued interest at the above contract rate through the date judgment is entered for the loss of use of the funds ZSI retained. They seek interest in excess of $1,727,692.53 for funds ZSI retained from January 31, 2001, until April 4, 2002, when ZSI turned over all but $3,418,793.17 of the amount in the operating accounts. Finally, they seek interest at this rate through the date of a judgment in their

favor for the funds ZSI still retained after April 4, 2002. The amount they seek for the retention of these funds exceeds $164,851.40.

All told, the Whitehall entities seek in this adversary action to recover interest totaling in excess of $2,168,056.30. The total amount the Whitehall entities seek to recover in withdrawn and retained funds and in interest for the loss of use of these funds exceeds $7,263,757.70.

■ Each of these categories of interest the Whitehall entities seek to recover includes *post*-petition interest. It is a long-standing principle in bankruptcy that interest on a pre-petition claim stops accruing once a bankruptcy petition is filed. *U.S. v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 246, 109 S.Ct. 1026, 1033, 103 L.Ed.2d 290 (1989). A pre-petition creditor, in other words, generally cannot recover post-petition interest on a pre-petition claim. *Matter of Fesco Plastics Corp., Inc.,* 996 F.2d 152, 155 (7th Cir.1993). This principle has been codified at § 502(b)(2) of the Bankruptcy Code.

This general principle serves numerous purposes. For instance, it promotes certainty and facilitates administration of the bankruptcy estate by arbitrarily fixing a time when the affairs of a debtor in bankruptcy are considered to be wound up. *Sexton v. Dreyfus,* 219 U.S. 339, 344—45, 31 S.Ct. 256, 257—58, 55 L.Ed. 244 (1911). It also preserves and protects the bankruptcy estate by saving it from having to pay for any delay in making payment to a creditor. *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 163, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946).

■ There are, however, three exceptions recognized in bankruptcy to this general proscription against payment of accrued post-petition interest. It may be allowed when: (1) the debtor in bankrupt-

cy proves solvent; (2) the collateral generates post-petition income or interest; and (3) where the collateral is sufficient to pay interest as well principal on a claim. *Thompson v. Kentucky Lumber Co. (In re Kentucky Lumber Co.),* 860 F.2d 674, 676–77 (6th Cir.1988) (*citing Matter of Walsh Construction,* 669 F.2d 1325, 1330 (9th Cir. 1982)).

■ The first of these exceptions has been codified at § 726(a)(5) of the Bankruptcy Code. Under this exception, if assets remain after all claims have been paid in full they are used to pay post-petition interest on allowed claims. Anything remaining after post-petition interest is paid is returned to the debtor pursuant to § 726(a)(6). Although § 726(a)(5) directly applies only to chapter 7 cases, it indirectly applies to chapter 11 cases through the "best-interest-of-creditors standard" relevant to plan confirmation found at § 1129(a)(7) of the Bankruptcy Code. *In re Kentucky Lumber,* 860 F.2d at 678. The third of these exceptions has been codified at § 506(b) of the Bankruptcy Code. *Matter of Fesco Plastics,* 996 F.2d 152, 155—56 (7th Cir.1993).

These exceptions have no application to this case. The second and third exceptions clearly do not apply. The Whitehall entities neither are over-secured creditors nor hold any interest-generating collateral belonging to ZSI to secure ZSI's obligation to them. They are creditors with general unsecured claims. More importantly, the Whitehall entities have not shown that the first exception applies to this case. No evidence was offered at trial to establish that ZSI was solvent. To the contrary, what we know about these bankruptcy cases in general suggests that ZSI was insolvent when it filed its chapter 11 petition.

We conclude in light of the foregoing that the Whitehall entities are *not* entitled

to post-petition interest on the amount ZSI withdrew from the operating accounts and spent or on the amounts they retained both before and after April 4, 2002.

— II —

Before the amount, if any, of the recovery to which the Whitehall entities are entitled can be determined, we must decide ZSI's counterclaim.

ZSI has asserted a counterclaim in the amount of $5,078,795.34 [1], which includes the $1,676,908.03 ZSI previously withdrew from the operating accounts and spent. At trial ZSI presented a lengthy list of amounts to which it claims it is entitled as a result of its performance as manager and leasing agent.

**1.) Management Fees.**

ZSI asserts that it is entitled to $306,656.54 in management fees for January of 2001 and to an identical amount in management fees for February of 2001. It seeks a total of $613,313.08 in unpaid management fees.

The Whitehall entities concede that ZSI is entitled to a management fee in this amount for January of 2001. They deny, however, that ZSI is entitled to any management fee for February of 2001.

Resolving this dispute requires us to determine the effective date of ZSI's termination as manager of the joint venture properties. ZSI asserts that its termination was not effective until the end of February of 2001. The Whitehall entities assert that ZSI's termination became effective at the end of January of 2001.

As was noted previously, the leasing and management agreements could be terminated without cause by either the White-

hall entities or by ZSI or could be terminated for cause by the Whitehall entities.

Paragraph 7.01 of the leasing and management agreements provided in part as follows:

> This Agreement ... shall terminate on the first anniversary of the effective date, unless extended or terminated earlier as hereinafter provided. The term of this Agreement shall be automatically renewed for successive one month periods unless either party delivers notice of termination to the other at least thirty (30) days prior to the commencement of the next succeeding renewal period.

Cause was not required for termination pursuant to this provision to be effective.

The leasing and management agreements also could be terminated by the property owner for cause pursuant to ¶ 7.03, which provided in part as follows:

> This agreement may be terminated for cause ... by Owner at any time (i.e., whether before or after the first anniversary of the effective date) on five (5) business days prior written notice to Manager.

According to basic tenets of contract law, a court must when interpreting a contract determine the intention of the parties thereto and should strive to give fair and reasonable meaning to the language employed in the contract. *Lyons v. Whitehead,* 291 A.D.2d 497, 499, 738 N.Y.S.2d 671, 673 (2002). The best evidence of what the parties to a written agreement intended is what they say in their writing. A written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms. *Greenfield v. Philles Records, Inc.,* 98 N.Y.2d 562, 569,

---

1. It most likely is not a coincidence that the total amount of ZSI's counterclaim is only $16,905.96 less than the amount in the operating accounts ZSI withdrew and then spent and the amount in the operating accounts which it retains to this day.

750 N.Y.S.2d 565, 569, 780 N.E.2d 166 (2002). This approach adds certainty to contract interpretation and enforcement. *Garal Wholesalers Ltd. v. Miller Brewing Co.*, 193 Misc.2d 630, 638, 751 N.Y.S.2d 679, 685 (N.Y.Sup.2002).

Construing ¶ 7.01 of the agreements according to what seems to be its clear and unambiguous language leads us to conclude that ZSI was terminated without cause effective as of January 31, 2001.

On December 7, 2000, the Whitehall entities sent letters to ZSI which stated that, pursuant to ¶ 7.01, they were terminating ZSI as property manager without cause, effective as of thirty days from the date of the notice. Follow-up letters to ZSI were sent on January 16, 2001, declaring that the thirty-day notice of termination was "now effective" and that "the Agreement is therefore terminated".

ZSI maintains that what it characterizes as the "strict constructionist approach" upon which the Whitehall entities rely in arriving at this conclusion is inappropriate for determining the effective date of its termination. We instead should, ZSI argues, utilize what it describes as a "practical construction" to determine the effective date of its termination as well as to determine numerous other issues pertaining to the leasing and management agreements. If we follow the "strict constructionist approach", ZSI argues, we would arrive at the obviously false conclusion that it was *never* terminated as manager of the properties. It argues as follows in support of this outcome.

Paragraph 9.05 of each agreement provided in part as follows:

> This Agreement shall be governed by and construed in accordance with the laws of the State of New York.... This Agreement represents the entire agreement between the parties hereto with respect to the subject hereof. This

Agreement may not be changed, waived, discharged or terminated orally but only by an instrument in writing signed by the person or entity against whom enforcement is sought.

ZSI points to the portion of ¶ 9.05 which provides that the agreements cannot be "changed, waived, discharged or *terminated* orally but only by an instrument in writing signed by the person or entity against whom enforcement is sought". ZSI did not sign any written instrument agreeing to its termination. If we "strictly construe" the language of the leasing and management agreements, ZSI argues, it follows that it was never terminated and consequently is still entitled to a management fee. Such a result, ZSI would have us conclude, is patently absurd and an indictment of the "strict constructionist approach" advocated by the Whitehall entities.

As an alternative to this "strict constructionist approach", ZSI would have us adopt a so-called "practical approach" when considering its counterclaim. Utilizing this latter approach, ZSI continues, it follows that ZSI was effectively terminated when General Growth supplanted it as manager of the properties at the end of January of 2001 even though ZSI did not sign a written instrument agreeing to its termination. From this ZSI would have us infer that its termination did not become effective until thirty days after it was supplanted and that it is entitled to a management fee for February as well as January of 2001.

This argument lacks merit. ZSI's interpretation of ¶ 9.05 runs roughshod over and violates a basic tenet of contract interpretation. It does not follow under the so-called "strict constructionist approach" that ZSI was never effectively terminated. The so-called "practical approach" ZSI urges us to follow as an alternative is

gratuitous and unnecessary to resolve this portion of its counterclaim.

■ When interpreting a provision in a contract one should not settle upon an interpretation which leaves one of its provisions substantially without force or effect. *E.g., Penguin 3rd Avenue Food Corp. v. Brook–Rock Associates*, 174 A.D.2d 714, 716, 571 N.Y.S.2d 562, 564 (1991). Reasonable effort must be made to harmonize all of its terms and provisions. *Village of Hamburg v. American Ref–Fuel Co. of Niagara*, 284 A.D.2d 85, 89, 727 N.Y.S.2d 843, 846 (2001).

The interpretation of ¶ 9.05 urged by ZSI effectively would deprive the without-cause and the for-cause termination provisions respectively found at ¶ 7.01 and ¶ 7.03 of their effect. A contract provision allowing the Whitehall entities to terminate ZSI, whether for cause or without cause, would have little or no force and effect if ZSI had to agree in writing to its termination as property manager before its termination took effect. Under the approach ZSI advocates, ZSI would remain as manager of the properties for an indefinite term, unless *it* decided otherwise. It is difficult to understand the point of a provision allowing for termination, especially termination for cause, if the party being terminated for cause had to agree in writing to its termination before it became effective.

There is a plausible and reasonable interpretations of the above language in ¶ 9.05 which does not deprive ¶ 7.01 and ¶ 7.03 of their force and effect. As we understand ¶ 9.05, it does *not* require ZSI to agree in writing to its termination before it can be effectively terminated as property manager whether for cause or without cause.

The sentence in ¶ 9.05 which states that the leasing and management agreement represented the entire agreement of the parties with respect to its subject matter is a garden-variety merger provision common to virtually all written contracts. The next sentence of ¶ 9.05, which provides that a leasing and management agreement "may not be changed, waived, discharged or terminated orally but only by an instrument in writing signed by the person or entity against whom enforcement is sought" appears to follow up the point made in the sentence preceding it and should be interpreted in that light.

This sentence of ¶ 9.05 paraphrases and incorporates N.Y. General Obligations Law § 15–301 (McKinney 2003), which provides in part as follows:

1. A written agreement ... which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and is signed by the party against whom enforcement of the change is sought ....

2. A written agreement ... which contains a provision to the effect that it cannot be terminated orally, ... cannot be terminated by mutual consent unless such termination is evidenced by a writing signed by the party against whom it is sought to enforce the termination ....

Of particular relevance here is the language stating that a written agreement containing a provision that it cannot be terminated orally unless such termination is evidenced by a writing signed by the party against whom termination is sought to be enforced. The language of ¶ 9.05 closely tracks this language.

As we understand § 15–301.2, the word "termination" is a reference to abrogation or nullification of an agreement in its entirety, not to terminating a party to the agreement. Put another way, § 15–301.2

provides that a written agreement which provides that it cannot be orally abrogated or nullified cannot be abrogated or nullified unless evidenced by a writing signed by the party against whom the agreement's abrogation or nullification is sought to be enforced.

Support for this interpretation of ¶ 9.05 is found in the words accompanying the word "terminated" as it appears therein. The terms "waived" and "discharged" denote situations in which an agreement lacks force or effect for one or another reason. We think the parties to the leasing and management agreements intended the same with respect to the word "terminated".

If the language of ¶ 9.05 is so understood, we avoid the undesirable result that ¶ 7.01 and ¶ 7.03 would have no force or effect unless ZSI agreed in writing to its termination. Under the interpretation of ¶ 9.05 we have arrived at, ¶ 9.05 does *not* require that ZSI agree in writing before its termination as manager of the joint venture properties can become effective.

We conclude in light of the foregoing that ZSI's termination as manager of the properties became effective as of January 31, 2001, at or about the time General Growth took over their management, and not as of February 28, 2001. From this it follows that ZSI is *not* entitled to a management fee for February of 2001. The allowed amount of its counterclaim for unpaid management fees is limited to $306,656.64.

Our rejection of the approach advocated by ZSI has ramifications for other elements of its counterclaim. As we shall see, ZSI would have us abandon what it has called "the strict constructionist approach" in favor of what it has called "a practical approach" which often examines extraneous factors when considering the elements of its counterclaim. We have rejected this suggestion and instead will apply the basic tenets of contract interpretation when considering these other elements.

## 2.) Employee Termination Costs And Satellite Lease Termination Costs.

To facilitate its performance after the leasing and management agreements went into effect, ZSI entered into five-year leases for office space in Dallas, Texas, and Pittsburgh, Pennsylvania. It also hired employees to staff the Dallas office and hired additional employees for its principal office in Johnstown, Pennsylvania.

Upon its termination as manager of the joint venture properties, ZSI terminated these satellite leases before their terms had expired and terminated the employees it hired for the Dallas office and some of the additional employees it hired for its Johnstown office. ZSI had to pay the terminated employees severance pay and accrued benefits such as sick pay, vacation days, personal days and the like.

ZSI seeks in its counterclaim to recover $100,000.00 and $200,000.00 in costs allegedly incurred in terminating early the Pittsburgh and Dallas leases, respectively. It also seeks to recover $90,291.46 in costs allegedly incurred in terminating Dallas employees and $ 297,913.70 in costs allegedly incurred in terminating some Johnstown employees.

Employee termination costs clearly are not reimbursable under the leasing and management agreements. Paragraph 6.06 of the agreements characterizes costs incurred with respect to ZSI's principal office personnel as non-reimbursable costs which are to borne by ZSI. Nothing in the leasing and management agreements indicates that such costs incurred in connection with employees at a satellite office are to be treated differently.

As for costs incurred in terminating the satellite office leases early, ZSI has pointed to no provision of the leasing and management agreements which entitles it to compensation for costs incurred in terminating such leases early. Apparently recognizing that the leasing and management agreements make no such provision, ZSI asserts in its post-trial brief that the leasing and management agreements were orally modified to delete the provision allowing for termination of the agreements without cause and that the Whitehall entities are estopped from denying that ZSI is entitled to such compensation for terminating the leases early and for costs it allegedly incurred in terminating these employees.

Damian Zamias testified at trial that he had expressed his concern after the leasing and management agreements became effective about the provision allowing for ZSI's termination without cause. In particular, he was concerned about the negative effect it would have on ZSI's willingness to make long-term commitments if the Whitehall entities could terminate ZSI without cause upon only thirty days' prior notice.

Damian Zamias further testified that Michael Klingher, an employee of the Whitehall entities, informed him that the Whitehall entities would never terminate ZSI without cause. Klingher allegedly assured Damian Zamias as late as August of 2000 that the Whitehall entities had no complaints about ZSI's performance and would give ZSI ample time to rectify future problems before taking any action against it.

Allegedly relying upon Klingher's assurances, ZSI entered into five-year leases for office space in Dallas and Pittsburgh and hired employees to staff these offices. In order to cut costs when it was unexpectedly terminated as property manager, ZSI had to terminate these satellite leases early along with the newly-hired employees.

ZSI maintains that the Whitehall entities are bound by Klingher's representation that the Whitehall entities would never terminate ZSI without cause and are precluded from repudiating his representation. Klingher, ZSI asserts, orally modified the leasing and management agreements on behalf of the Whitehall entities to eliminate termination without cause from the agreements. Because it relied on this representation, ZSI would have us conclude, the Whitehall entities are estopped from denying liability for these costs ZSI incurred. This argument is entirely without merit.

We have seen that a written agreement containing a provision prohibiting its oral modification in general can be modified only by "an executory agreement ... in writing" which is signed by the party against whom enforcement of the modification is sought or by its agent. N.Y. General Obligations Law § 15–301.1 (McKinney). The written agreement controls, in other words, if the only evidence of an agreement to depart from the provisions of the written agreement consists of an oral exchange between the parties to the written agreement. *DFI Communications v. Greenberg*, 41 N.Y.2d 602, 606–07, 394 N.Y.S.2d 586, 589–90, 363 N.E.2d 312 (1977).

There is no writing signed by the Whitehall entities or its agent which modifies the leasing and management agreements to delete ¶ 7.01. ZSI asserts that it was modified orally.

 There are several recognized exceptions to this general prohibition. An oral modification of a written agreement may be enforceable if the party seeking to enforce the alleged oral modification has partially performed and its partial perfor-

mance is unequivocally referable only to the claimed oral modification. *Rose v. Spa Realty Associates*, 42 N.Y.2d 338, 343–44, 397 N.Y.S.2d 922, 926, 366 N.E.2d 1279 (1977). A contractual provision prohibiting oral modification also may be waived. *Id.*, 42 N.Y.2d at 343, 397 N.Y.S.2d at 926, 366 N.E.2d 1279. Finally, a party may under certain circumstances be equitably estopped from invoking a provision prohibiting oral modification. The conduct relied upon by the party claiming an oral modification must not otherwise be compatible with the agreement as written. *Id*, 42 N.Y.2d at 344, 397 N.Y.S.2d at 927, 366 N.E.2d 1279.

 The alleged partial performance undertaken by ZSI—i.e., hiring additional employees and entering into leases for office space in Dallas and Pittsburgh—does *not* unequivocally refer only to the purported oral modification whereby the parties allegedly agreed to delete the provision in the leasing and management agreements allowing for termination without cause. The actions undertaken by ZSI could just as well have been undertaken merely to facilitate ZSI's performance of its obligations under the leasing and management agreements as written.

 There also is no basis for concluding from the testimony offered by ZSI at trial that the Whitehall entities effectively waived the provision against oral modification found at ¶ 9.05 of the leasing and management agreements. Waiver is a voluntary abandonment or relinquishment of a right which, except for such waiver, the party would have enjoyed. *Dice v. Inwood Hills Condominium*, 237 A.D.2d 403, 404, 655 N.Y.S.2d 562 (1997). The existence of a provision precluding waiver does not necessarily preclude its waiver. It may be accomplished by express agreement or by such conduct or failure to act as evidences an intention not to invoke the

right. *Hadden v. Consolidated Edison Co. of New York*, 45 N.Y.2d 466, 469, 410 N.Y.S.2d 274, 275, 382 N.E.2d 1136 (1978).

We do not find credible the testimony of Damian Zamias that Michael Klingher ever represented to Damian Zamias that the Whitehall entities would never terminate ZSI without cause. This contractual provision was material to the relationship by and between the parties and was of such great moment that it would not have been waived in such a cavalier fashion. Had a waiver in fact occurred, we would expect there to be more formal evidence thereof.

 Even if he did so represent, we do not regard the representation as a knowing relinquishment of the right the Whitehall entities had to terminate ZSI without cause. Assuming that he so represented, Klingher merely intended to allay any concerns Damian had by *predicting*, albeit erroneously, that termination of ZSI without cause would not occur in the future. This falls short of waiver by a long shot.

 Finally, the evidence presented at trial does not warrant the inference that the Whitehall entities should be equitably estopped from invoking the provision in the leasing and management agreements precluding their oral modification. ZSI's actions in purported reliance upon Klingher's alleged representation—i.e., hiring additional employees and leasing office space in Dallas and Pittsburgh—are not otherwise incompatible with the agreements as written. It is probable that ZSI would have taken these actions even in the absence of such an alleged representation by Klingher so that it could effectively carry out its duties under the agreements as written.

 It should be noted that this element of ZSI's counterclaim would be de-

nied even if it had overcome all of the above obstacles. It is axiomatic that the burden lies with ZSI to provide a basis for computing the amount of its loss. *See Broadway Photoplay Co. v. World Film Corp.*, 225 N.Y. 104, 109, 121 N.E. 756, 758 (1919).

ZSI provided no convincing basis whatsoever for determining the amount of its alleged loss with respect to satellite leases it had to terminate early and costs allegedly incurred in terminating employees once it was terminated as manager of the joint venture properties. It instead merely recited amounts which appear to be cut from whole cloth and have no apparent basis in reality. We have given no weight to such evidence.

**3.) Asset Management Fee.**

ZSI seeks to recover $52,042.87 for what it characterizes as an "asset management fee" for the second, third and fourth quarters of, presumably, the year 2000. ZSI did not bother to clarify what this supposed fee is for and how it differs conceptually from the previously-discussed management fee.

This alleged fee is not recoverable. ZSI has cited to no provision in the leasing and management agreements which allows for recovery of such a fee. Moreover, we know of no such provision.

Even if the leasing and management agreements had provided for payment of such a fee, ZSI provided no persuasive basis for computing the amount thereof. As is the case with most elements of ZSI's counterclaim, both this claim and the amount thereof appear to be fabrications.

**4.) CDC Due Diligence Costs And Termination Legal Costs.**

 ZSI seeks to recover $100,000.00 in legal fees for due diligence allegedly provided by its in-house counsel in connec-

tion with the refinancing of a portion of a portfolio of properties owned by one of the Whitehall entities. It also seeks to recover $335,000.00 for services allegedly provided by its in-house counsel in providing information to General Growth after it succeeded ZSI as manager of the properties. Neither of these elements of ZSI's counterclaim is recoverable in this case. .

Not only did ZSI fail to identify any portion of the leasing and management agreements which entitled it to compensation for due diligence services it provided in connection with the CDC refinancing, it was obligated to provide such services *without* receiving additional compensation. Paragraph 2.12 of the leasing and management agreements provided that:

> Manager shall cooperate with and assist Owner from time to time in any attempt by Owner to sell, finance or refinance any of the Property. Such cooperation shall not entitle Manager to any additional compensation.

This item also is not compensable because ZSI provided no basis for determining the amount allegedly owed. ZSI was not able at trial, for instance, to specify how much time was spent by whom providing what services. It conceded that $100,000.00 was merely an estimate of the value of the due diligence services allegedly provided. The lack of evidence presented at trial to substantiate this amount leads us to conclude that $100,000.00 was more a guess than an estimate of the value of the services allegedly provided.

The so-called "termination legal costs" requested also are not recoverable for basically the same reasons.

ZSI was *obligated* to provide such information to General Growth pursuant to paragraph 2.13 of the leasing and management agreements, which provided in part that:

... Manager shall assist Owner in coordinating with any successor manager of the Properties to ensure a smooth transition from Manager to such successor property manager.

Moreover, ZSI identified no specific provision of the leasing and management agreements which called for payment of a separate fee to ZSI for providing such services to General Growth after it had succeeded ZSI as manager of the properties.

Paragraph 7.04(d) of the leasing and management agreements specifically provided as follows:

In the event of any termination of this Agreement, Manager shall be entitled to the payment of any management fees and reimbursable expenses accrued and/or due through the effective date of any such termination.

No mention is made in this provision or elsewhere in the leasing and management agreements of entitlement to post-termination legal costs.

Finally, ZSI provided no basis for determining the value of the work allegedly provided in this regard by its in-house counsel. In particular, it failed to provide any evidence concerning who spent how much time performing what specific services and did not explain how it arrived at $335,000.00 as the value of the services it allegedly provided. The stated amount is mere speculation.

### 5.) Temporary Leasing Fees.

 Pursuant to paragraph 6.01(c)(V) of the leasing and management agreements, ZSI was entitled to a commission equal to ten percent of the gross receipts received from temporary leases it had negotiated with tenants. ZSI seeks to recover $155,886.71 in leasing fees for *renewed* temporary leases it had negotiated with tenants which were finalized and executed prior to its termination.

Paragraph 6.01(b)(I) defines "temporary lease" as follows:

"Temporary lease"—any lease ... for space in the respective Property for a term of less than twelve (12) months, which is executed by or on behalf of Owner with a tenant ... not presently in occupancy of space in the respective Property and which tenant ... has not been in occupancy of space in the respective Property as a tenant, assignee, subtenant or licensee prior to execution of such lease ....

This latter provision clearly excludes *renewed* temporary leases from the scope of paragraph 6.01(c)(V). Temporary leases with tenants who had occupied space in the property previously clearly do not qualify as "temporary leases" for purposes of paragraph 6.01(b)(I) and, consequently, do not qualify under paragraph 6.01(c)(V).

ZSI concedes that under a "strict constructionist approach" it would not be entitled to recover a fee for renewed temporary leases. It argues that we should put aside such an approach and instead should take a "practical approach" in construing the leasing and management agreements. Denying it a fee for renewed temporary leases, ZSI insists, defies common sense and standard industry practice by discouraging ZSI from seeking and obtaining renewed temporary leases from temporary tenants.

This argument manifestly is without merit. We previously rejected ZSI's contention that in certain instances we should discard the so-called "strict constructionist approach" in favor of a "practical construction approach" when construing the leasing and management agreements. We should instead look first to the clear, unambiguous language of the agreements to determine what ZSI and the Whitehall

entities intended with respect to a particular matter. The clear, unambiguous language of the leasing and management agreements compels the conclusion in this instance that ZSI and the Whitehall entities intended that ZSI would not be entitled to a fee for renewed temporary leases it had negotiated and brought to completion prior to its termination. It is irrelevant that such a rule may be contrary to industry practice and common sense. That is what the parties bargained for and intended.

ZSI apparently also seeks to recover $355,572.00 for "temporary tenant fees owed" and another $218,900.00 for "temporary tenant fees—completed deals". We say "apparently" because ZSI did not address these elements of its counterclaim anywhere in its post-trial brief. Neither, for that matter, did the Whitehall entities.

What the difference is between temporary tenant fees that are "owed" and those that are "completed deals" is not obvious. We can only surmise what the difference is supposed to be and we decline to do so.

Fortunately it is not necessary to agonize over this distinction in the vacuum left by ZSI's failure to address this issue and to divine the difference. While ZSI may (or may not) be entitled to payment of temporary tenant fees that allegedly are "owed" and may (or may not) be so entitled with respect to such fees for "completed deals", ZSI provided no plausible basis for determining or computing the amounts to which it is entitled. ZSI instead merely stated at trial what these amounts were without providing an explanation or support for the amounts claimed. We consequently have no basis for concluding that ZSI truly is entitled to those amounts and give no weight to the conclusory testimony offered at trial concerning these amounts.

## 6.) Leasing Fees For Pipeline Deals And For Completed Deals.

 ZSI seeks to recover $744,495.00 in leasing fees for alleged "pipeline deals" and another $161,557.00 in leasing fees for alleged "completed deals".

The difference between these categories, as with others, is not obvious. Testimony was offered at trial that a "pipeline deal" was a negotiated deal to lease space with a new tenant which had not been finalized when ZSI was terminated as property manager. We can only surmise that a "completed deal" was something different.

ZSI has pointed to no language of the leasing and management agreements which provides for payment of any kind of leasing fees that accrued *after* ZSI's termination. Paragraph 7.04(d) of the agreements provides for payment of management fees and expenses that accrued through the effective date of termination but makes no reference to leasing fees. We are aware of no provision of the leasing and management agreements which allows for payment of fees for leases that had not been "finalized" by the effective date ZSI's termination.

Moreover, the leasing and management agreements appear to *preclude* payment of leasing fees for new leases which had not been finalized by the time of ZSI's termination. Paragraph 6.01(c)(IX) of the agreements provided as follows:

Commissions due in respect of New Leases shall be paid one-half (1/2) upon execution of a lease by Owner and the tenant and Owner's receipt of any security deposit required by the lease to be paid at execution (if any) and the first month's rent; the remaining one-half of the commission shall be payable only if: (1) the term of the lease has commenced; (2) the rent for the first month of the term is paid to Owner; (3) the tenant takes occupancy of the leased

premises; and (4) the tenant delivers to Owner a tenant estoppel certificate confirming the acceptance of possession of the premises and the commencement of the term of the lease.

The plain and unambiguous language of this provision makes it clear that a leasing commission is not due and owing until, at a minimum, a lease is actually executed by the tenant and the property owner. The leasing fees at issue here arise out leases that were not executed prior to ZSI's termination and consequently are not recoverable.

In addition to leasing fees for "pipeline deals" and "completed deals", ZSI seeks to recover $102,375.00 in leasing fees in connection with Kohl's Department Store in Rhode Island Mall. As was the case for "pipeline deals" and "completed deals", ZSI did not specifically address this element of its counterclaim in its post-trial brief and made no attempt to establish its entitlement to such a fee. The Whitehall entities also did not address this element in their post-trial brief.

As far as we are able to determine, the lease for Kohl's Department Store in Rhode Island Mall was not finalized and executed until *after* ZSI was terminated as property manager. In this respect it most likely belongs in the category of "pipeline deals" but, for unknown reasons, was listed as a separate element of the counterclaim. ZSI's claim for these leasing fees must be denied for the same reason as its claim for leasing fees for "pipeline deals" and "completed deals"

Finally, even if ZSI were entitled under the provisions of the leasing and management agreements to all of these fees, its request to recover the amounts stated must be denied for the same reason as we have denied most or all of the other elements of its counterclaim. ZSI presented no persuasive evidence from which we might determine the amounts of these claims. It instead merely offered summary exhibits which simply stated amounts due without providing any basis for computing the proper amounts. We have given no weight to such evidence.

Perhaps because it recognizes that such fees are not provided for in the leasing and management agreements, ZSI once again argues in its post-trial brief that we should depart from the leasing and management agreements as written—i.e., should abandon the "strict constructionist approach"—and should uphold its request for these fees on other grounds.

ZSI first argues that such fees should be allowed because its termination was in breach of an oral modification allegedly agreed to by Michael Klingher, whereby the provision allowing for termination of ZSI without cause was deleted from the leasing and management agreements. This argument is without merit.

We previously rejected ZSI's assertion that Michael Klingher orally agreed to so modify the leasing and management agreements. Moreover, even if such an oral modification had occurred and was enforceable, we do not see how it logically follows that ZSI's claim for these leasing fees should be allowed. Such a conclusion in our estimation is a *non sequitur*.

ZSI also asserts that the Whitehall entities acted in bad faith in terminating it as manager of the properties and that its claim for these leasing fees therefore should be allowed. This assertion also lacks merit.

▆▆▆ Good faith and fair dealing generally are presumed when parties enter into a contract. *Integrated Sales, Inc. v. Maxell Corp.*, 94 A.D.2d 221, 226, 463 N.Y.S.2d 809, 812 (1983). Such a covenant cannot, however, negate a party's express right to terminate the agreement without

cause. *Berzin v. W.P. Carey & Co., Inc.,* 293 A.D.2d 320, 321, 740 N.Y.S.2d 63, 64 (2002). The Whitehall entities had an absolute, unqualified right under the leasing and management agreements to terminate ZSI as manager without cause. Its decision to exercise that right is not subject to subsequent judicial scrutiny. *See A.J. Temple Marble & Tile, Inc. v. Long Island Railroad,* 256 A.D.2d 526, 527, 682 N.Y.S.2d 422, 423 (1998).

Lastly, even if the Whitehall entities exhibited bad faith in terminating ZSI, once again we do not see how it follows that ZSI's claim for the above leasing fees therefore should be allowed. As was the case with the prior argument, such a conclusion would be a howling *non sequitur.*

### 7.) Transition Accounting Costs And Final Audit Costs.

■■ Preparation of a preliminary accounting and a final audit were required by paragraph 7.04(a)(1) of the leasing and management agreements, which provided in part as follows:

> (a) Upon termination of this Agreement for any reason, Manager shall deliver to Owner ... as soon as reasonably possible, but in no event ... later than five (5) days following the termination date:
>
> > (1) A preliminary accounting shall be submitted within fifteen (15) days, reflecting the balance of income and expenses for the Properties as of the date of termination, with a final accounting to be prepared and submitted to Owner as soon as reasonably possible, but in no event later than thirty (30) days following the termination date.

ZSI seeks to recover $225,000.00 for costs allegedly incurred in preparing a "transition accounting" and a final audit for the Whitehall entities after its termination as manager. These costs clearly are not recoverable in this case.

We know of no provision in the leasing and management agreements which allows for recovery of such costs. To the contrary, recovery of such costs is expressly *precluded* by paragraph 6.06(b) of the leasing and management agreements, which provides as follows:

> The following expenses or costs incurred by or on behalf of Manager in connection with the operation of Manager's business shall be the sole cost and expense of Manager and shall not be reimbursable by Owner: . . . .
>
> > (b) General accounting and reporting services, as such services are considered to be within the reasonable scope of Manager's responsibility to Owner . . . .

Finally, as is the case for virtually every element of its counterclaim, ZSI offered no persuasive basis at trial for determining the amount of such alleged costs. It instead merely submitted a summary exhibit setting forth various costs to which we accord no weight.

### 8.) Construction Management Fee.

■■ Paragraph 6.04 of the leasing and management agreements provides in part as follows:

> . . . . With respect to any specific project the costs for which exceeds $99,999.99, Owner agrees to pay Manager a construction management fee equal to three percent (3%) of the total development (construction related) costs . . . .

Pursuant to this provision ZSI seeks to recover $363,422.00 in alleged construction management fees. ZSI presented testimony at trial that, with the exception of major construction projects, it had failed due to an oversight on the part of its accounting department to collect these fees as they became due on construction projects it had managed prior to its termination as property manager.

ZSI undoubtedly was entitled to such a fee in accordance with the language of paragraph 6.04. Unfortunately for ZSI, the evidence it presented at trial was grossly inadequate to enable one to determine the amount due and owing. It merely offered a summary exhibit setting forth amounts purportedly due. We have accorded no weight to such an exhibit.

Lest it seem harsh to deny altogether an element of ZSI's counterclaim which undoubtedly is provided for in the leasing and management agreements, it should be noted that the total amount of ZSI's counterclaim is $5,078,795.34, only $16,905.96 less than the amounts it unlawfully withdrew and unlawfully retained from the operating accounts. We reluctantly have concluded that, in an attempt to avoid a substantial monetary judgment in favor of the Whitehall entities, ZSI has asserted a counterclaim which is comprised largely of elements having no basis whatsoever in the leasing and management agreements.

We have no doubt that the amount of virtually every element of its counterclaim, including those provided for in the leasing and management agreements, was grossly inflated so that the total amount of its counterclaim would more or less equal the amounts it withdrew from the operating accounts and spent and the amounts it retained. As a consequence, ZSI is in the unfortunate position of not being able to provide a persuasive basis for computing the amounts owed for the various elements of its counterclaim which in fact are provided for in the leasing and management agreements. ZSI, in other words, is hoist with its own petard!

## 8.) Property Management Transition Costs And Construction Transition Costs.

ZSI seeks to recover $90,000.00 for management costs it allegedly incurred during the transition period after General Growth replaced it as manager of the properties and $247,522.68 in construction costs it allegedly incurred during the transition.

ZSI has pointed to no provision of the leasing and management agreements which allows for recovery of any property management or property construction costs it allegedly incurred during the transition period—i.e., *after* it was terminated as manager of the properties. Our review of the leasing and management agreements has not revealed the presence any such provision.

Paragraph 7.04(d) of the leasing and management agreements, which provides for payment of fees due upon ZSI's termination, provides only that ZSI is entitled to payment of management fees and reimbursable costs "accrued and/or due through the effective date of any such termination". Property management transition costs and construction transition costs allegedly incurred after its termination are not included.

Even if ZSI were entitled under the leasing and management agreements to recover these transition costs, it did not provide any persuasive basis upon which one could determine the amounts to which ZSI is entitled. ZSI merely recited amounts without any explanation or substantiation thereof and left matters at that. We have given such evidence the weight it deserves—i.e., none.

## 9.) Marketing Costs Reimbursement.

ZSI seeks to recover $417,764.00 in marketing costs it allegedly incurred.

ZSI conceded at trial that the leasing and management agreements contain no

provision for the reimbursement of marketing costs. Damian Zamias instead testified at trial that Angie Madison, vice-president of certain of the Whitehall entities, at some unspecified time approved ZSI's request for reimbursement of such costs.

Damian Zamias' testimony on this point, which directly conflicts with the testimony of Angie Madison, is not credible and is contradicted by other evidence presented at trial. For instance, ZSI's CFO testified that Angie Madison had not approved ZSI's request by December 7, 2000, when the first notice of termination was sent to ZSI. Moreover, ZSI sent a series of letters to Angie Madison, one as late as December 7, 2000, requesting approval of its request for reimbursement of this expense. It defies belief that the Whitehall entities would have agreed to ZSI's request after the first notice of termination went out on December 7, 2000.

 In addition, as we have stated numerous times already, ZSI provided no basis at trial upon which one can determine the amount of the reimbursement to which ZSI would be entitled even if Angie Madison had approved its request.

**10.) Property Level Open Payables.**

ZSI seeks to recover $80,036.08 for something called "property level open payables". No explanation was provided of this element of the counterclaim. We have been left to divine on our own what this phrase refers to.

We are at a loss to say whether this element of the counterclaim is provided for in the leasing and management agreements. Needless to say, in its post-trial brief ZSI pointed to no provision of the leasing and management agreements which calls for payment of this item. Moreover, paragraph 6.05 of the leasing and management agreements, which enumerates reimbursable expenses, makes no mention of "property level open payables".

The only evidence offered at trial pertaining to the amount of this element of the counterclaim was a summary exhibit which merely recited various amounts as due and owing. No back-up documentation was submitted to substantiate these amounts. As is the case with other summary exhibits ZSI presented at trial, we accord it no weight.

**11.) Unreimbursed Due Diligence Expenses.**

ZSI seeks to recover $29,709.26 for unspecified "due diligence expenses". Precisely what these purported expenses were for is far from clear.

This element of ZSI's counterclaim is not reimbursable because it was incurred by George D. Zamias Developer, which is not a party to the leasing and management agreements, and not by ZSI. No reason has been given why ZSI should recover due diligence expenses allegedly incurred by another entity. ZSI has cited to no provision of the leasing and management agreements, and we know of none, which provides for ZSI's recovery of such expenses.

Even if ZSI somehow were entitled to repayment of such expenses, it has provided no basis for determining the amount it should recover. ZSI merely submitted at trial a ledger of George D. Zamias Developer without offering any substantiation of the amounts listed on the ledger. We have given no weight to the ledger.

The obvious inappropriateness of this claimed expense only serves to reinforce our conviction that, in an effort, to avoid a substantial judgment in favor of the Whitehall entities, ZSI contrived a counterclaim consisting of inappropriate ele-

ments in the hope that some of them might avoid scrutiny and would be allowed.

### 12.) Leasing Legal Fees.

ZSI seeks to recover $90,250.00 for what it characterizes as "leasing legal fees". What these fees pertain to is not obvious. ZSI has not bothered to elaborate in its post-trial brief.

ZSI has not pointed to any provision of the leasing and management agreements which provides for payment of this fee. We do note that paragraph 6.01(c)(VII) of the agreements provides that ZSI is entitled to a flat in-house legal fee of $750.00 for each new or renewal small shop lease and to $2,000.00 for each department store lease. We can only speculate whether this is the provision upon which ZSI relies in asserting entitlement to these fees.

Assuming that this is the provision upon which ZSI relies in asserting this element of its counterclaim, it would appear that ZSI is entitled to payment of some amount pursuant thereto.

Unfortunately for ZSI, however, it has not provided any basis for determining the amount which it is entitled to receive for in-house leasing legal fees. All ZSI has offered as evidence in support of this element of its counterclaim is the bare assertion that this is the correct amount owed. We obviously have given no weight to this assertion and must conclude that ZSI has not established with a scintilla of persuasiveness that it is owed some amount for such fees.

### 13.) Management Fees On Lease Cancellation Income.

Finally, ZSI seeks to recover $79,560.00 in management fees on lease cancellation income.

Once again, it is not clear what these fees pertain to. ZSI has failed to address this portion of its counterclaim in its post-trial brief.

Also once again, ZSI has not referred to any provision of the leasing and management agreements which would entitle it to such a management fee. Paragraph 6.01 of the agreements, which provides for payment of management fees, makes no mention of a fee pertaining to lease cancellation income. Because ZSI has the burden of proof on this matter, we must conclude that ZSI is not entitled to any such management fee.

We conclude in light of all of the foregoing that, with respect to ZSI's counterclaim, it is entitled to $306,656.64 for management fees due and owing for the month of January 2001. The remainder of its $5,078,795.34 counterclaim must be denied.

— III —

The Whitehall entities contend that a portion of the post-petition interest to which they are entitled for loss of use of funds in the operating accounts ZSI withdrew and/or retained is entitled to priority treatment as an administrative expense in accordance with §§ 503(b)(1) and 507(a)(1) of the Bankruptcy Code.

According to the Whitehall entities, interest which is due at the contract rate as set forth in paragraph 3.05 of the agreements with respect to the balance in the operating accounts from May 11, 2001, when ZSI filed its bankruptcy petition, until April 4, 2002, when ZSI turned all but $3,418,792.17 to the Whitehall entities, is entitled to treatment as an administrative expense pursuant to § 503(b)(1). In addition, they assert that interest at the contract due on the amount ZSI retained after April 4, 2002, is entitled to the same treatment. The total amount the Whitehall entities assert is entitled to such treatment exceeds $1,415,641.89.

As support for their position, the Whitehall entities rely upon the rationale in *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), and its progeny which have extended its rationale to intentional post-petition injuries inflicted by a debtor while in bankruptcy. *E.g.*, *Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.)*, 755 F.2d 200, 203 (1st Cir.1985).

We need not address this contention in detail, as it rests on the erroneous premiss that the Whitehall entities are entitled to post-petition interest on these amounts. We previously determined that the Whitehall entities are *not* entitled to any post-petition interest on these amounts. The entirety of their claim therefore shall be treated as a pre-petition general unsecured claim.

— IV —

According to the Whitehall entities. Damian Zamias and George Zamias are personally liable to them for the total amount ZSI withdrew from the operating accounts and spent as well as the total amount it withdrew and retained. This debt, they assert, is excepted from discharge by § 523(a)(4) of the Bankruptcy Code, which provides in part as follows:

> (a) A discharge under section ... 1141 ... of this title does not discharge an individual debtor from any debt—....
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;...

11 U.S.C. § 523(a)(4).

The remedial purpose of the Bankruptcy Code is "to provide a procedure by which insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life [and] a clear field for future effort, unhampered by the pressure and the discouragement of pre[-]existing debt". *U.S.A. v. Fegeley (In re Fegeley)*, 118 F.3d 979, 982 (3d Cir.1997) (*quoting Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991)).

This "fresh start" policy applies, however, only to the "honest but unfortunate debtor". *Grogan*, 498 U.S. at 286–87, 111 S.Ct. at 659. Bankruptcy is intended to "relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh". *Boston University v. Mehta (In re Mehta)*, 310 F.3d 308, 311 (3d Cir.2002).

Bankruptcy is not only an "ameliorative right" of the debtor; it also is a remedy for creditors. *Id.* Protecting creditors becomes more important under certain circumstances than giving a debtor a "fresh start". *Id.* Accordingly, a debtor may not be permitted in all instances to "escape all financial obligations" by the mere expedient of bankruptcy. *Id.* Exceptions to discharge are, however, generally construed "narrowly against the creditor and in favor of the debtor" due to this underlying concern for providing a "fresh start". *Id.* (quoting *In re Pelkowski*, 990 F.2d 737, 744 (3d Cir.1993)).

A creditor objecting to the discharge of a debt owed to it has the burden of proving, by a preponderance of the evidence, that the debt falls within one of the numerous exceptions found at § 523(a) of the Bankruptcy Code. *Grogan*, 498 U.S. at 291, 111 S.Ct. at 661.

The phrase "while acting in a fiduciary capacity" which appears in § 523(a)(4) modifies the phrase "fraud or defalcation"; it does not modify the terms "embezzlement" and "larceny". *See* 4 *Collier on Bankruptcy* (15th ed. revised), ¶ 523.10[1][c] at 523–72. A creditor, in other words, need not show that the debtor was acting in a fiduciary capacity when

committing embezzlement or larceny. *Transamerica Commercial Finance Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir.1991).

■ "Embezzlement" is defined for purposes of § 523(a)(4) as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come". *E.g., Miller v. J.D. Abrams, Inc. (Matter of Miller)*, 156 F.3d 598, 603 (5th Cir.1998), *cert. denied*, 526 U.S. 1016, 119 S.Ct. 1249, 143 L.Ed.2d 347 (1999); *In re Littleton*, 942 F.2d at 555 (*quoting Moore v. U.S.*, 160 U.S. 268, 269, 16 S.Ct. 294, 295, 40 L.Ed. 422 (1895)).

Some courts have inserted the term "conversion" in this definition in place of the term "appropriation". *E.g., Bennett v. Wright (In re Wright)*, 282 B.R. 510, 517 (Bankr.M.D.Ga.2002); *Rentrak Corp. v. Cady (In re Cady)*, 195 B.R. 960, 964 (Bankr.S.D.Ga.1996).

■ Embezzlement has three requirements: (1) property that is rightfully in the possession of a non-owner; (2) the non-owner's appropriation of the property to a use other than for which it was entrusted; and (3) circumstances indicating fraud. *E.g., In re Littleton*, 942 F.2d at 555; *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1173 (6th Cir.1996).

■ The first of the above requirements of embezzlement unquestionably is present in this case. ZSI was authorized under the leasing and management agreements to collect rents and other sums from tenants at the various mall properties. All amounts so collected were to be deposited into operating accounts under the control of ZSI and were the sole property of the mall owners (¶ 2.06(a)). ZSI had no ownership interest therein and held the funds in trust for the mall owners (¶ 3.01(a)).

The second of the above requirements of embezzlement also is satisfied in this case. At the direction of Damian Zamias, ZSI withdrew funds from certain operating accounts and used them to pay debts owed by ZSI and other Zamias-related entities, some of whom are not debtors in bankruptcy. Also at his direction, ZSI withdrew and retained a portion of the funds in the operating accounts for the ostensible purpose of satisfying ZSI's (largely bogus) counterclaim against the Whitehall entities. In accordance with a consent order approved on April 4, 2002, ZSI turned over to the Whitehall entities the lion's share of these retained funds but retained $3,418,792.17 to cover the remainder of its counterclaim. Counsel to debtors has given assurance that this latter amount has been escrowed and has not been spent by debtors or by Zamias-related non-debtors.

Use of a portion of the withdrawn funds to pay debts owed by ZSI and other Zamias-related entities was for a purpose other than was contemplated in the leasing and management agreements and constituted a *mis*appropriation thereof. Funds in the operating accounts were to be used to pay operating expenses of the malls (¶ 3.01), not to pay the debts of ZSI and other Zamias-related entities. The same is no less true of the funds in the operating accounts over which ZSI still retains control.

As a matter of law, ZSI converted the funds which were withdrawn from the operating accounts and were used to pay debts as well as those funds which were withdrawn and retained by ZSI.

Conversion is defined as the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification. *Stevenson v. Economy Bank of Ambridge*, 413 Pa. 442, 451, 197 A.2d 721, 726 (1964). The unjustifiable exercise of con-

trol over the chattel must be intentional; specific intent to commit a wrong is not, however, required. *L.B. Foster Co. v. Charles Caracciolo Steel & Metal Yard, Inc.*, 777 A.2d 1090, 1095 (Pa.Super.2001).

Applying this definition to the facts of this case, we conclude that ZSI intentionally deprived the Whitehall entities of the use of the funds in the operating accounts without their consent. Moreover, the deprivation was without lawful justification.

ZSI was obligated under the leasing and management agreements to turn over to the property owners within five days of its termination any funds held in the operating accounts (¶ 7.04(a)(ii)). Authority to draw checks on the operating accounts ceased immediately upon termination (¶ 7.04(b)). ZSI was required to relinquish control over the accounts at that time (¶ 7.04(c)).

Of the four contested withdrawals from the operating accounts which were used to pay the debts of ZSI and other Zamias-related entities, three occurred after the January 31, 2001, effective date of ZSI's termination. As for the funds which ZSI withdrew and retained, to date ZSI has refused to turn over $3,418,792.17 to the Whitehall entities.

ZSI insists that the withdrawals and disposition of these funds was justified to the extent that it is entitled to payment of the fees and expenses detailed in its counterclaim. Its actions, ZSI maintains, were based on its entitlement to such payments. This assertion lacks merit.

We previously examined ZSI's counterclaim in laborious detail and have determined that, with the exception of its claim for the management fee owed for January of 2001, the counterclaim was meritless. The vast preponderance of the specific elements of the counterclaim lacked any colorable basis and appeared to be after-the-

fact fabrications meant to counteract the claim of the Whitehall entities.

Based on the foregoing, we conclude that ZSI converted the funds in the operating accounts which are at issue here and that the second of the requirements for embezzlement is satisfied for purposes of § 523(a)(4).

 It makes no difference for present purposes that ZSI, the corporate entity, and not Damian Zamias, misappropriated the above funds. Although embezzlement is committed by individuals, not corporations, an individual will not be permitted to shield himself from a dischargeability objection based on embezzlement by asserting that he merely was functioning as an officer of the corporation. This is especially true where, as here, the individual acted as the president of the corporation. *See KMK Factoring v. McKnew (In re McKnew)*, 270 B.R. 593, 632 (Bankr. E.D.Va.2001); *Matter of Berkemeier*, 51 B.R. 5, 6 (Bankr.S.D.Ind.1983). ZSI was under the total domination and control of Damian Zamias. A directive from him had the force of a *fiat*. If he said to do something, ZSI did it without any questions being asked.

 To the extent that ZSI converted the funds belonging to the Whitehall entities at his behest, Damian Zamias also is personally liable under the so-called "participation doctrine". An officer of a corporation who takes part in the commission of a tort committed by the corporation is personally liable for any misfeasance. Liability attaches where the officer participated as an actor in the wrongful act. *Wicks v. Milzoco Builders, Inc.*, 503 Pa. 614, 621–22, 470 A.2d 86, 90 (1983). This doctrine has been applied where the tort in question was conversion. *See Knuth v. Erie–Crawford Dairy Cooperative Association*, 463 F.2d 470, 481, (3d Cir.1972),

*cert. denied,* 410 U.S. 913, 93 S.Ct. 966, 35 L.Ed.2d 278 (1973).

Damian Zamias actively participated as an officer of ZSI in depriving the Whitehall entities of the above funds in the operating accounts without their consent and without lawful justification. Accordingly, he is personally liable along with ZSI for the conversion.

Finally, we conclude that the third of the above requirements for embezzlement also is satisfied in this case. Circumstances compellingly indicate that the funds in the operating accounts were *fraudulently* misappropriated.

The most telling indication that the misappropriation was fraudulent is the surreptitious manner in which it was done. ZSI sought to keep the Whitehall entities (as well as others) "in the dark" until its misdeeds were a *fait accompli* and it was too late to prevent the misappropriation.

The withdrawals occurred without the knowledge of the Whitehall entities, who never gave their consent, until several months after they had taken place. Moreover, the withdrawals took place in direct contravention of letters from the Whitehall entities admonishing that ZSI no longer had authority to make withdrawals or otherwise direct the application of the funds in the operating accounts. ZSI thereafter refused to turn over the relevant bank account statements to the Whitehall entities, who did not learn about the withdrawals until they subpoenaed the statements from the banks.

Moreover, ZSI deliberately misled the Whitehall entities *and the court* when it falsely asserted in its May of 2001 response to the first motion of the Whitehall entities for a preliminary injunction that no withdrawals from the operating accounts had occurred. Even ZSI's bankruptcy counsel had no knowledge of the falsity of this assertion until July of 2001 at the earliest. ZSI, in other words, was so intent on keeping its actions secret that it concealed what it had done even from its bankruptcy counsel until some two months after filing its chapter 11 petition. The truth did not come out until September of 2001, when ZSI sheepishly asserted in its response to the second motion of the Whitehall entities for a preliminary injunction that it had "misspoken" when it previously denied having withdrawn any funds from the operating accounts. ZSI apologetically—and implausibly—explained that its prior response had been prepared "in haste".

ZSI was so obsessed with keeping what it had done secret that, at the direction of Damian Zamias, the withdrawn funds initially were deposited into an account of another Zamias-related entity to conceal their whereabouts from APC, which had garnished ZSI's bank accounts in an attempt to satisfy a $12,000,000 judgment it had against ZSI.

Finally, the schedules accompanying ZSI's chapter 11 petition made no mention of the withdrawn funds. At the very least, we would expect ZSI to have listed that portion of the funds which it still held as an asset of its bankruptcy estate. We are not surprised that no such information can be gleaned from the schedules.

It has been held that embezzlement does not occur where one acts under an erroneous belief that one is entitled to take a certain course of action with respect to another's property. *E.g., Matter of Miller,* 156 F.3d at 603. In a last-ditch effort to avoid the inference that he embezzled the funds in the operating accounts, Damian Zamias testified at trial that he directed ZSI to take action with respect to funds in the operating accounts only after consulting with various attorneys and being ad-

vised that ZSI was entitled to withdraw and to retain the funds at issue here.

We do not find credible the testimony of Damian Zamias concerning this matter. To begin with, we think it improbable that Damian Zamias would seek such legal advice and then not inform bankruptcy counsel of his actions. As we have seen, bankruptcy counsel was treated like a mushroom and was "kept in the dark" until July of 2001. Even if Damian Zamias was so advised by outside counsel, it is "curious" that said counsel did not testify at trial to corroborate Damian's testimony. Moreover, given what we know about the circumstances surrounding the withdrawals, we find it unlikely that any counsel with knowledge of the same facts as are before us would have advised Damian Zamias to do what he ultimately did.

The real reasons why Damian Zamias directed ZSI to surreptitiously withdraw funds from the operating accounts and to spend some of it and to withhold a portion from the Whitehall entities are not difficult to discern. He did so because ZSI and other Zamias-related entities were financially strapped. In his own words, Damian Zamias did so "to keep the ship afloat". The matter does not end there. Damian Zamias also did so in a brazen attempt to gain leverage in the looming dispute with the Whitehall entities over ZSI's termination as manager of the various mall properties. It was his way of "playing hardball". As Damian Zamias testified at trial, "when you're in a fight, you're in a fight, whether you like it or not".

We conclude in light of the foregoing that: (1) ZSI converted the funds in question; (2) Damian Zamias is liable for the conversion along with ZSI under the so-called "participation doctrine"; (3) Damian Zamias committed embezzlement when he directed ZSI to withdraw and spend a portion of the funds in the operating ac-

counts and to withdraw and retain another portion; and (4) the debt Damian Zamias owes to the Whitehall entities is excepted from discharge by virtue of § 523(a)(4) of the Bankruptcy Code.

The Whitehall entities also seek a determination that George Zamias, the father of Damian Zamias, owes them a debt for the same reason and that said debt is excepted from discharge on the same basis. The Whitehall entities have not met their burden of proof with respect to George Zamias. Little, if any, evidence, was presented at trial linking George Zamias to the fraudulent misappropriation of the funds in the operating accounts.

— V —

The salient conclusions arrived at in this memorandum opinion may be summarized as follows.

ZSI unlawfully and without justification withdrew and spent or retained funds totaling $5,095,701.20 from various operating accounts, which funds were the property of the Whitehall entities.

Except for $306,656.54 in management fees owed to ZSI for January of 2001, ZSI is entitled to recover nothing with respect to its counterclaim against the Whitehall entities.

Subtracting the amount which ZSI is entitled to recover from the amounts it unlawfully withdrew from the operating accounts and either spent or retained, the Whitehall entities are entitled to recover the sum of $4,729,044.66. The Whitehall entities are not, however, entitled to recover interest with respect to any portion of these amounts and are not entitled to a post-petition administrative expense priority with respect to any portion thereof.

Damian Zamias is personally liable in this amount for conversion of the above funds.

Damian Zamias embezzled the above funds for purposes of § 523(a)(4) of the Bankruptcy Code. As a consequence, the debt he owes to the Whitehall entities is excepted from discharge.

Finally, the Whitehall entities have failed to prove that George Zamias is personally liable to them and consequently have failed to prove that such debt is excepted from discharge.

An appropriate order shall issue.

### ORDER OF COURT

AND NOW, at Pittsburgh this **4th** day of **June,** 2003, in accordance with the accompanying memorandum opinion, it hereby is **ORDERED, ADJUDGED,** and **DE-CREED** that judgment in the amount of $4,729,044.66 is entered **IN FAVOR OF** plaintiffs in this adversary action and **AGAINST** debtors Zamias Services, Inc. and Damian Zamias. The debt owed by Damian Zamias is **EXCEPTED FROM DISCHARGE.**

It is further **ORDERED, ADJUDGED,** and **DECREED** that judgment is entered **IN FAVOR OF** debtor George Zamias and **AGAINST** plaintiffs in this adversary action.

It is **SO ORDERED.**

