

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-14-2002

# In Re: Rajesh Mehta

Precedential or Non-Precedential: Precedential

Docket No. 01-2586

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"In Re: Rajesh Mehta " (2002). *2002 Decisions.* Paper 729.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/729

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed November 13, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-2586

IN RE: RAJESH MEHTA,
        Debtor

BOSTON UNIVERSITY,
        Appellant

v.

RAJESH MEHTA

Appeal from the United States District Court
For the District of New Jersey
(D.C. No. 00-cv-05448)
District Judge: Hon. William H. Walls

Argued: February 4, 2002

Before: BECKER, McKEE and BARRY, Circuit Judges

(Opinion filed: November 13, 2002)

        Louis G. Rubino, Esq. (Argued)
        White & Williams
        222 Haddon Avenue
        Suite 300
        Westmont, N.J. 08108
         Attorney for Appellant

        Theodore Kozlowski, Esq. (Argued)
        Suite 201
        20 Park Place
        Morristown, N.J. 07960
         Attorney for Appellee

OPINION OF THE COURT

McKEE, Circuit Judge:

In this case of first impression, we are asked to decide if
a student's outstanding tuition balance at the university he
was attending can be discharged in bankruptcy. Rajesh
Mehta initiated a bankruptcy proceeding in which he
attempted to discharge tuition and fees he owed to Boston
University. The university opposed discharge arguing that
the outstanding balance of Mehta's tuition and fees
constituted either a "loan" or a debt for an "educational
benefit" under 11 U.S.C. S 523(a)(8), and was therefore not
dischargeable in bankruptcy. The district court entered

partial summary judgment for Mehta and against the
university, and this appeal followed.1  For the reasons that
follow, we will affirm.2

I. Background.

Rajesh Mehta attended Boston University (hereinafter
referred to as "BU") from the Fall 1992 semester through
the end of the Fall 1993 semester. He received federally
guaranteed student loans for the Fall 1992 and Spring
1993 semesters. However, his loan application for the Fall
1993 semester was denied, and he failed to secure any
other financial assistance for that semester. Nevertheless,
BU allowed Mehta to register and continue taking classes.
Mehta completed the semester, and received academic
credit for three classes. As a result, he incurred charges for
delinquent tuition and related costs totaling $9,331.00.
That amount subsequently increased to $12, 953.73 when
interest and late fees were added. Mehta eventually filed a
petition for voluntary bankruptcy under Chapter 7 without

_____

1. The bankruptcy court also ruled that the student's delinquent
federally guaranteed loans were not dischargeable in bankruptcy. That
ruling has not been appealed, and is therefore not before us.

2. Inasmuch as our inquiry is limited to the proper interpretation of a
provision of the Bankruptcy Code, our review is plenary. In re Roth Am.,
Inc., 975 F.2d 949, 952 (3d Cir. 1992).

2

satisfying his obligation to BU, and his petition listed BU as
a general unsecured creditor in the amount of $15, 434.00.3
He subsequently filed an adversary complaint with the
bankruptcy court to determine the dischargeability of his
obligation to BU.

BU opposed discharge under 11 U.S.C. S 523(a)(8), and
both parties eventually filed motions for summary
judgment. The parties agreed that $2,000 of the
outstanding balance was for a federally guaranteed
educational loan that was not dischargeable. The court
rejected BU's argument that the remainder of Mehta's debt
was not dischargeable under 11 U.S.C. S 523(a)(8), and
granted partial summary judgment in favor of Mehta in the
amount of his delinquent tuition, late fees and interest. The
district court affirmed.

II. Discussion.

11 U.S.C. S 523 provides in relevant part:

        (a) a discharge under section 727, 1141, 1228(a),
        1228(b) or 1328(b) of this title does not discharge an
        individual debtor from any debt--

        ***

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents

11 U.S.C. S 523(a)(8) (1994).

We look to the text of a statute to determine congressional intent, and look to legislative history only if the text is ambiguous. New Rock Asset Partners, L.P. v.

_____

3. A portion of that delinquency included the amount Mehta owed on nondischargeable government student loans.

Preferred Entity Advancements, Inc., 101 F.3d 1492 (3d Cir. 1996). Where statutory language is plain and unambiguous, " 'the sole function of the court is to enforce it according to its terms.' " Id. At 1498 (quoting United States v. Ron Pair Enters., Inc., 481 U.S. 235, 241 (1989)). Plain meaning is therefore conclusive, " 'except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' " Id.

Congress did not define "loan" in S 523, and courts that have been called upon to interpret that provision have not agreed upon its meaning. BU urges us to broadly interpret the statute and thus declare that Mehta's debt constitutes a loan or a debt for an educational benefit that is not dischargeable in bankruptcy. Mehta of course disagrees. He argues for a narrow interpretation consistent with the remedial purpose of bankruptcy.

Courts have long recognized that bankruptcy is intended to "relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh." In re Renshaw, 222 F.3d 82, 86 (2d Cir. 2000)(quoting Williams v. U.S. Fidelity & Guar. Co., 236 U.S. 549, 554-555 (1915)). However, bankruptcy is not only an ameliorative right of the debtor; it is also a remedy of the creditor. Matter of Marchiando, 13 F.3d 1111, 1115 (7th Cir. 1994). Accordingly, although bankruptcy is concerned with giving honest debtors a new beginning, "there are circumstances where giving a debtor a fresh start in life is not the paramount concern and protection of the creditor becomes more important." Renshaw, 222 F.3d at 86. Thus, the law does not allow debtors to escape all financial obligations by declaring bankruptcy. However, in large part because of bankruptcy's underlying concern for affording a new beginning, statutory exceptions to discharge are generally construed "narrowly against the creditor and in favor of the

debtor." In re Pelkowski, 990 F.2d 737, 744 (3d Cir. 1993). The creditor opposing discharge therefore has the burden of establishing that an obligation is not dischargeable. Grogan v. Garner, 498 U.S. 279 (1991).

These conflicting policy considerations have created a certain tension that is reflected in the exclusions contained

in S 523 and the legislative history of the Bankruptcy Code. That history has been detailed in In re Johnson , 218 B.R. 449, 451-54 (B.A.P. 8th Cir. 1998), and outlined in Renshaw. Accordingly, we will only touch upon it here.

A. Overview of 11 U.S.C. S 523(a)(8).

When Congress established the Guaranteed Student Loan Program under the Higher Education Act of 1965, it sought to increase the availability of low interest, federally guaranteed loans in order to make higher education more affordable for a greater number of qualified students. S. Rep. No. 89-673, (1965), reprinted in 1965 U.S.C.C.A.N. 4027, 4055. However, the Bankruptcy Reform Act of 1978, 11 U.S.C. S 523(a)(8), placed restrictions on students' ability to discharge these loans in bankruptcy because Congress was concerned about reported abuses of students who obtained the benefits of higher education while avoiding repaying student loans by declaring bankruptcy shortly after graduation. Subsequent amendments expanded the scope of the statute to its current form.

Prior to the Reform Act of 1978, loans were fully dischargeable in bankruptcy. The law provided as follows: "Upon default by the student borrower on any loan covered by Federal loan insurance . . . the insurance beneficiary shall promptly notify the Commissioner, and the Commissioner shall . . . pay to the beneficiary the amount of the loss sustained by the insured . . .". Higher Education Act of 1965, Pub. L. No. 89-329, S 430(a), 79 Stat. 1219, 1260 (1965) (amended 1976). Thus, the statute required the federal government to repay the educational institution if the student defaulted. A Congressional Commission subsequently recommended prohibiting discharge of educational obligations for the first five years after graduation unless the student faced undue hardship. See Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 93-137, at pts 1 & 11 (1973). In 1976, Congress passed S 439A of the Education Amendments of 1976, which added a limited nondischargeability provision. See Education Amendments of 1976, Pub. L. No. 94-482, S 439A(a), 90 Stat. 2081, 2141 (codified at 20 U.S.C. S 1087-2) (1976) (repealed 1978).

Section 439A was repealed in 1978, and 11 U.S.C. S 528(a)(8) -- the current provision -- took effect on October

1, 1979.[4]

## B. Is Mehta's Tuition Debt a "loan"?

BU contends that Mehta's tuition debt arose from an extension of credit for educational services, and that it is therefore tantamount to an educational "loan" that is excluded from discharge in bankruptcy under 11 U.S.C. S 523(a)(8). The university rests this argument in large part upon various provisions of its Student Accounting Services Department's handbook. That booklet is referred to as "The Guide," and it is apparently given to all BU students upon registration or enrollment. BU notes that "The Guide states that '[b]y registering for any class in the University, each student accepts and agrees to be bound by' certain University regulations and policies." (Brackets in original). Appellant's Br. at 19. These regulations and policies include each student's obligation to pay all applicable fees and charges, including tuition.[5] Accordingly, BU argues: "when Mehta registered for class at BU a contract was formed whereby Mehta agreed to pay a defined quantity of money in exchange for a defined set of services, i.e. classes/tutition credits." Appellant's Br. at 19. BU allowed Mehta to attend classes during the Fall 1993 semester without first paying tuition, and BU claims that the parties to the resulting "agreement" therefore clearly understood

_____

4. For an explanation of the "stop-gap" legislation that filled the gap between the repeal of S 439A and the effective date of S 523(a)(8), see Johnson, 218 B.R. at 453.

5. More specifically, The Guide provided:

> Boston University's policy requires the withholding of all credit, educational services, issuance of transcripts, and certification of academic records from any person whose financial obligations to the University (including delinquent student accounts, deferred balances, and liability for damages) are due and/or unpaid. . . . By registering for any class in the University, each student accepts and agrees to be bound by the foregoing University policy as applied to any preexisting or future obligation to the University.

App. at A.39.

that BU was extending a "loan" to Mehta in the amount of the Fall 1993 tutition, and that both BU and Mehta intended that result. However, the Court of Appeals for the Second Circuit rejected an analogous argument in Renshaw, and we find that court's analysis persuasive.

In Renshaw, the court consolidated the appeals of two students from different colleges who were each attempting to discharge delinquent tuition obligations in bankruptcy, 222 F.3d at 84. In both cases, the respective colleges objected, arguing that S 523(a)(8) excluded delinquent tuition from discharge. Id. Renshaw had been allowed to

register and attend classes without first paying tuition after
he signed a "Reservation Agreement" that the college had
executed before Renshaw signed. Id. at 85.

> That agreement obligated [the college] to hold a place
> open for Renshaw, provided he paid the amounts billed
> when due, and not to charge him more for tuition than
> the amount that was in effect on the applicable
> registration date. The Agreement further required
> Renshaw to pay a $285 reservation fee when he
> returned it, to pay tuition, room, and board for the
> 1992 summer session and 1992-93 academic year, and
> to be bound by various payment-related provisions set
> out on the back of the Agreement and in the college
> catalog. These provisions included an obligation to pay
> a "service charge" with an effective annual rate of 19.2
> percent if payments on the student's account were not
> made by their due dates.

Id. The college claimed that the executed Registration
Agreement constituted a loan under S 523 because it
allowed Renshaw to register without prepaying based upon
his promise to pay at a future date pursuant to the terms
of the Reservation Agreement. Id. at 89. The court rejected
that argument. Id.

The court looked first to the common law definition of
"loan" to interpret the meaning of S 523(a)(8). Id. at 88.
Under common law, "[t]o constitute a loan there must be (i)
a contract, whereby (ii) one party transfers a defined
quantity of money, goods, or services, to another, and (iii)
the other party agrees to pay for the sum or items

7

transferred at a later date." 222 F.3d at 88; see also, In re
Grand Union, 219 F. 353, 356 (2d Cir. 1914). The court
reasoned that "[t]his definition implies that the contract to
transfer items in return for payment later must be reached
prior to or contemporaneous with the transfer. Where such
is the intent of the parties, the transaction will be
considered a loan regardless of its form." 222 F.3d at 88.
However, the court concluded that the delinquent tuition
obligations of the two students before it did not amount to
loans because there was no "agreement" to extend credit,
"or to permit the student to attend classes in return for a
payment of tuition at a future date." Id. Instead, in both
cases, the student simply "unilaterally decided not to pay
tuition when it came due." Id. The court concluded that the
colleges could well have prohibited the students from
attending classes but they "chose not to do so." Id. The
court also noted that both colleges had failed to reach any
agreement "about future class attendance or an extension
of credit." Id.

Here, BU attempts to draw support from the analysis in
Renshaw by emphasizing that the court there stressed that
the exclusion contained in S 523(a)(8) applies if the parties
intended a loan "regardless of its form." Id. at 88. We agree

that form can not be elevated over substance, and that the intent of the parties must therefore dictate whether Mehta's debt to BU is excluded from discharge under S 523(a)(8). However, this only undermine's BU's claim; it does not advance it.

Mehta, like the students in Renshaw, simply"unilaterally decided not to pay tuition when it came due." 222 F.3d at 88. This record simply does not allow us to conclude that BU intended to loan Mehta the amount of the tuition for the Fall 1993 semester when it allowed him to register and attend classes or that Mehta understood that to be BU's intent. It does not appear that BU ever made any inquiry into Mehta's creditworthiness or that it ever required him to execute any kind of promissory note or loan agreement. The document that allegedly constitutes Mehta's loan agreement -- The Guide -- is nothing more than the type of generalized informational handbook that colleges and universities routinely supply to all students. It contains

8

various fee schedules, and informs students of their financial obligations, optional payment plans, and refund procedures, as well as various remedies the university may exercise to collect delinquencies. It also explains how to replace meal and identification cards; and it provides information about medical insurance, as well as students' entitlement to "admission to Boston University football, hockey, and basketball games." App. at A.41.

The Guide is, therefore, far less suggestive of a"loan" than the Reservation Agreement in Renshaw. In Renshaw, the university and the student both executed the Reservation Agreement. That agreement contained language far more characteristic of a loan agreement than The Guide. For example, as noted above, it provided that interest would accrue at a specified rate. Yet, the various provisions of the Reservation Agreement were still insufficient to transform the understanding between the university and student into a loan under S 523. Rather, the Renshaw  court concluded that "none of [those] casual covenants[met] the definition of loan." Renshaw, 222 F3d at 84.

Although courts have reached different results when determining if forbearance in collecting tuition amounts to a loan, we agree with the distinction drawn in Renshaw between those cases holding that delinquent tuition is dischargeable under S 523(a)(8) and those holding it is not.6 Renshaw instructs that courts have generally held that nonpayment of tuition can qualify as an educational loan under S 523(a)(8) "only in two classes of cases." See Renshaw, 222 F.3d at 90. Courts have reached that conclusion "where funds have changed hands," or where "there is an agreement . . . whereby the college extends credit . . . ."Id. The court included In re Joyner, 171 B.R. 762, 763 (Bankr. E.D. Pa. 1994), as an example of the first class of cases, and In re Merchant, as an example of the

6. Compare In re DePasquale, 225 B.R. 830 (Bankr. 1st Cir. 1998); In re Johnson, 218 B.R. 449 (Bankr. 8th Cir. 1998); In re Merchant, 958 F.2d 738 (6th Cir. 1992); In re Hill, 44 B.R. 645 (Bankr. D. Mass. 1984); Najafi v. Cabrini College, 154 B.R. 185 (Bankr. E.D. Pa. 1993) (disallowing discharge) with In re Renshaw, 222 F.3d 82 (2nd Cir. 2000), and Seton Hall Univ. v. Van Ess, (In re Van Ess) 186 B.R. 375 (Bankr. D.N.J. 1994) (allowing discharge).

9

latter class. As the Renshaw court noted, the university in In re Merchant required the student to sign a promissory note evidencing the student's agreement with the university, and the university's extension of credit. That was found probative of the parties' intent even though neither a formal promissory note, nor written agreement, is a prerequisite to proving a "loan" so long as the circumstances allow the educational institution to satisfy its burden of proof.7

Ironically, BU relies heavily upon In re DePasquale, 225 B.R. 830 (B.A.P. 1st Cir. 1998), in arguing that allowing Mehta to attend classes without first paying the tuition he knew he owed constituted a loan. There, BU allowed DePasquale to attend classes without prepaying tuition only after engaging in protracted discussions with the student that lasted for two years. 225 B.R. at 831. BU finally relented and allowed DePasquale to register and attend classes without prepaying, but only after reaching an individualized agreement that BU would continue to bill her but allow her to register and pay tuition at some later time.8 Furthermore, "[a]s a condition of receiving her degree," Depasquale executed a promissory note "promising to pay BU $22,607.05." Id. The court held that BU's arrangement with DePasquale constituted a loan within the meaning of S 523(a)(8). Id. at 833. However, that is very different than the situation here.

In fact, when we compare how BU handled DePasquale's delinquency with how it handled Mehta's, it is even more

---

7. See generally, Renshaw, 222 F.3d at 90. See also In re Hill, 44 B.R. 645 (Bankr. D. Mass.1984), wherein a student's loan application in the amount of the semester's tuition was pending, and the university extended a credit in the amount of the loan application without interest "to be paid as soon as he received the proceeds of his student loan." 44 B.R. at 647. The bankruptcy court held that the credit in the amount of the loan was nondischargeable under S 523(a)(8). Id.

8. The court noted, "In the fall of 1998, after more than two years of negotiations, BU permitted DePasquale to attend classes without prepaying her tuition. Although BU billed DePasquale for tuition, it was agreed that she would pay tuition later. They did not set a payment schedule." 225 B.R. at 831. The record is not clear as to the interest that was charged in DePasquale though it appears that interest did accrue.

evident that BU can not establish that Mehta's delinquency is excluded from discharge under S 523(a)(8). BU's argument to the contrary would have us equate the generalized information in The Guide with the specific undertakings contained in the promissory note it demanded of DePasquale.9 As noted above, the court in Renshaw referred to the obligations specified in the Reservation Agreement (including the promise for a specific amount of interest accruing) as "casual covenants." 222 B.R. at 84. The terms of The Guide are even more "casual," and can hardly be considered "covenants." Although Mehta was no doubt aware of his obligations, as BU contends, awareness of an obligation does not establish that the parties intended a "loan."

BU's attempt to distinguish Seton Hall v. Van Ess (In re Van Ess), 186 B.R. 375 (Bankr. D.N.J. 1994), where the court did grant discharge is equally unpersuasive. The court there held that a student's delinquent tuition was dischargeable because the exceptions to discharge contained in S 523(a) "should be narrowly construed against the creditor in order to carry out the rehabilitative policy of the Bankruptcy Code." Id. at 377-8. Inasmuch as the contrary construction urged by the university there would have been inconsistent with that liberal, rehabilitative policy, the court held that "a common sense reading of 11 U.S.C. S 523(a)(8) reveals that the Debtor's nonpayment of his tuition bill did not result in an extension of credit." Id. at 378. After examining the legislative history, the court concluded "[t]here is no overriding policy that warrants treating [the university] differently from any other creditor. Indeed, given the ready availability of student grants and loans, one might very well conclude that [the university] is particularly well situated to avoid defaults on tuition obligations." Id. at 379. The accuracy of that observation is demonstrated by BU's actions in DePasquale. All BU had to do here was have Mehta sign the same kind of agreement it had DePasquale sign.

BU suggests that Van Ess is distinguishable because the

_____

9. The record does not reflect whether BU issued The Guide to students when DePasquale registered there.

court there expressed doubt about the number of classes the student actually attended during the semester in question, and because that student, unlike Mehta,"did not participate in any student loan programs." Appellant's Br. at 14. However, those distinctions do not establish a difference. It is clear from the portion of the court's opinion quoted above that the court in Van Ess simply concluded that delinquent tuition, without more, is not exempted from discharge under S 523(a)(8). Here, as in Van Ess, the record contains nothing that would allow us to find that the

university and the student actually intended a loan. Accordingly, we will not now create a loan agreement where none otherwise exists.

C. Mehta's Delinquency is not a Debt for an Educational Benefit Under S 523(a)(8).

BU relies in part upon Najafi v. Cabrini College, (In re Najafi), 154 B.R. 185 (Bankr. E.D. Pa. 1993) in making an alternative argument. BU claims that even if its"extension of credit" to Mehta was not a "loan," Mehta's delinquency is still not dischargeable because it represents an "educational benefit" under S 523(a)(8). As noted above, in addition to excluding educational loans from discharge, S 523(a)(8) also excludes "any debt . . . for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, . . . ."

However, we are not persuaded by the analysis in Najafi. The court there inserted commas into the relevant sections of S 523(a)(8) and interpreted the statute as it read after that change in punctuation. The court explained:

> We believe that the absence of commas in the phrase "educational benefit overpayment or loan made" makes this phrase difficult to interpret. However, as Pelkowski, supra, teaches, 990 F.2d at 742-44, there is no support for the Debtor's contention, similar to that asserted by the Pelkowski debtor, that S 523(a)(8) must be read narrowly. We believe that, when reading the Code section more broadly than the Debtor suggests,

12

> the terms "benefit," "overpayment," and"loan" should be construed as a series of nouns, all modified by the adjective "educational." Therefore, we conclude that his debt, assuming arguendo that it could not be classified as an "educational loan," falls within the scope of S 523(a)(8).

154 B.R. at 190.

However, the statute that resulted from the court's editing is not the statute that Congress drafted. The court in Renshaw properly rejected the analysis in Najafi, and so do we. Renshaw concluded that the exemption in S 523(a)(8) only applies where there has actually been an overpayment for an educational benefit program such as the GI bill. 222 B.R. at 92. This is because Congress concluded, as a policy matter, that the fiscal integrity of such educational programs takes priority over giving the individual debtor a fresh start. It therefore excluded such programs from the discharge that is otherwise available in bankruptcy. Accordingly, if a program such as a federally funded loan program makes an overpayment to a student, the student can not escape repayment by filing for

bankruptcy. See Renshaw, 222 B.R. at 92. That is not the situation here.

We also reject any attempt to suggest that Mehta's obligation falls within S 523(a)(8)'s exclusion of obligations for "funds received as an educational benefit. . . ." No funds have been advanced by BU or received by Mehta for the semester in question.

D. Equitable Considerations.

Finally, BU makes an equitable argument in support of its opposition to discharging Mehta's outstanding tuition. The university reminds us that it has litigated the same issue of dischargeability in a different jurisdiction and prevailed. See Appellant's Br. at 22 (citing DePasquale). Accordingly, argues BU, lack of uniformity in various jurisdictions will leave it vulnerable to the "luck of the draw" and promote forum shopping by students seeking to discharge educational debts.

13

However, we have already explained that Mehta's situation differs from DePasquale's and that the holding in DePasquale undermines BU's claim here to the extent that DePasquale does apply. Furthermore, we fail to see how this logistical problem of BU's own making translates into the kind of equitable consideration that is cognizable in bankruptcy. As noted above, BU does not have to do anything more than it did in DePasquale to protect itself from the parade of horribles it now marches in front of us. Absent some similar evidence of a "loan,"S 523(a)(8) does not apply. Therefore, neither equity nor our construction of the statute allows us to reach the result BU urges upon us. See Peller v. Syracuse Univ. (In re Peller), 184 B.R. 663 (Bankr. D.N.J. 1994).

III. Conclusion.

Accordingly, for the reasons set forth herein, we will affirm the judgement of the district court.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

14